May it please the court, my name is Chris Curtis and I'm here to argue on behalf of Christopher Robert Weast. In this case, the most fundamental issue that was repeatedly and undisputedly brought before the district court was Mr. Weast's right to represent himself. Mr. Weast consistently and repeatedly requested to represent himself and there is absolutely no question that that request was denied by the district court. For my count, Mr. Weast requested no less than eight times in the record the right to represent himself. He did it in a letter to the court. Early on, that letter was referred to the magistrate judge and in that hearing, Mr. Weast unequivocally asserted his right to self-representation. That's clear of the record in that hearing. He also presented his request to represent himself repeatedly in written motions, supplements to those written motions, and motions to reconsider the district court's denial. He clearly wanted to represent himself, but what do you do with his disruptive behavior? Fair enough, Your Honor. What you do perhaps is what the district court maybe did do, but the issue of his disruptive behavior does not give the court reason to deny him the right to self-representation. It seems like we made a jump in this case from you want to answer my questions and you want to persist in your questioning the jurisdiction of the court, we're going to remove you to another room and use a video feed, but in fact, when the court did that, the court allowed Mr. Weast to question a government expert from the video feed and it went quite well. It's probably one of the more stellar moments in the courtroom for Mr. Weast. He questioned the witness effectively. The judge was able to, if he got disruptive and interrupted the court, he was able to cut him off with the video feed, and Mr. Weast knew that was how it would work, and we, when I say we, the public defender, presented that in a . . . Are you suggesting that's what should have continued, they should have just continued with that arrangement? That's what I think, Your Honor. I think that's what we presented very clearly in a motion. It was either our second or third motion to withdraw, or one of our supplemental motions we just said, Your Honor, he doesn't want to . . . he won't even talk to us. He refuses to recognize us as his counsel. This system that you came up with would allow him to represent himself, and the judge just didn't follow that request or that advice, and I think that was a reasonable request. I think it was reasonable by the public defender's office to suggest that that would be the answer. Let him represent himself, and if the court felt like standby counsel was necessary to be in the courtroom, or in the room removed from the courtroom, or both for that matter, that could have been done. The problem is, it's never harmless error to deny the right to self-representation. If it's an improper denial of self-representation, it's never harmless. I assert to the court that it was an improper denial of the right to self-representation in this case, and it was not harmless, and in this particular case, it was particularly egregious for the reason that Mr. Weiss made it clear from early on that he did not want the public defender, he wanted to represent himself, and he also made it clear he wanted to present this jurisdictional argument. Now we all know that the case law is not going to be very favorable to him in that regard, and he's not going to get very far with that jurisdictional argument, but that's the defense he wanted to present. I thought he did make that argument. He made it to the court, but . . . Yes, he did lead to the court on . . . He did. He did. On his own? He did. It's interesting, too, though. The only time he ever got an answer to that question, and I think that was part of where the disruption came from, from reviewing the record in preparation for today, and of course, looking over the briefs, but I was there. I was co-counsel on this case during the trial of the case, but from reviewing the record, I noticed two things. He became disruptive when he didn't get an answer to the jurisdictional question, and I don't know . . . I could be wrong, but going back, the only court that I saw answer his question was the Magistrate Judge Curtin specifically explained, took a moment to explain to him where jurisdiction lies on this case. Well, I thought the district court did as well. I don't think he did. Well, he said this is the federal district court under the federal constitution. Wasn't that the district court? I think that was . . . I mean, it's in district court, but I think it was Magistrate Judge Curtin, and I don't think . . . he kept asking the district court. I could be wrong. I went back over the record a couple of times, so I could be wrong on this, but my recollection was he kept asking the judge, what is your jurisdiction, and he didn't get an answer from the district judge. Well, he got denied was the answer. Yeah, he did get denied. That is true. That's an answer. So, is it your position that it's never permissible to deny the right to self-representation where someone is disruptive? Because certainly this record is replete with disruption and multiple chances. So, do you have to go all the way to say it's never permissible for you to win? I don't think so. I think it is. It's a fundamental Sixth Amendment right to self-representation. It's fundamental. I think there . . . You have Edwards and Ferrara from the high court. You have Vannier from our court. Yes, sir. All of which say that the district court can do exactly what this court did, or something similar to that, if they're anticipating disruptive behavior. If that's sound, then you're left to argue that there's an act dictating disruptive behavior. I think . . . What am I missing in that? Well, I think there's one thing that I have caught on that, and it's illustrated probably best in the Canoe case, or Can-O-K-C-A-N-O, out of this court. The specific language, and they're relying on Ferretta, is a defendant may waive the right through subsequent conduct that indicates an abandonment of the right. In Canoe, and in Long, the Long case relied on by the government as well. That's what you have. You have someone who, through their conduct, they have abandoned the right. He never abandons, when I say he weest, never abandons that right. He's persistent, and he asked the court, don't I have a right to self-representation, which was another question he didn't get asked. I think O'Brien is speaking to a somewhat different problem. The defendant that is engaged in disruptive behavior is plainly persisting in an effort to defend himself. But the issue is rather a distinct one from the quote that you just gave us. It is rather that the court's obligation and right to conduct a trial without that disruption. So I go back to the question of was there an adequate basis from what he had done for the court to project that this would be so disruptive that he could not allow him to continue to represent himself? Yes, Your Honor, and I think this answers both of your questions, and that is that my position is, I do think that's right. What I was pointing out is that the language that's relied on for the courts to do that, I think, is more focusing on the abandonment of the right. But I think you're both exactly right that, of course, if somebody becomes so disruptive, the court has to have the ability to say self-representation is not going to happen. It's just you've gone too far. But in . . . So you're saying here that he didn't go far enough? In this case, when the judge put him in the other room and did the video feed, I think at that point there . . . and we have suggested that in a written motion. It's not something we hid behind the log on. We came to the judge and we said, Judge, he's in the other room. He wants to represent himself. He seemed to do okay. And at that point, you're just talking about a matter of convenience, because he's certainly not going to hurt anybody, and he's certainly not able to interrupt the court when the court does not want to be interrupted. It's disruptive, nonetheless. I mean, he said . . . on May 21st, he was disruptive. In May 28th, he was so disruptive, they couldn't do the competency hearing. He was extremely disruptive in July the 8th. He was disruptive on July 15th, but the court said, even now, if you can try to not be disruptive. And then he was disruptive again, repeatedly, on July 22nd, and then on July 28th. How many disruptive chances do you get before the court can take . . . because you're not saying the rule, I asked you, and you're not saying never. So at some point, the court is allowed to say you're too disruptive. So why isn't this record good enough? It's not the issue of whether the record's good enough. The issue is, is what this record shows is, the judge came up, the district judge came up with an answer. He put him in another room and gave him a video feed. And there's no . . . and then we just jumped to no self-representation. There's no indication that he couldn't represent himself and present his arguments in that situation, that that answered the question. It doesn't . . . but it doesn't . . . it doesn't rise to the level of . . . that nothing happens after he's been put in that room that would prevent him from being able to represent himself from that situation. Well, and what do you do when there are motions to approach the bench?  Yes, Your Honor. When you're confined in a video room, you can't approach the judge. I mean, there are practicalities here. Well, I think the defendant would say, I want to approach the bench, Your Honor. And he could either excuse the jury or he could even do a . . . he could leave the bench and address the video, through video or actually in person with the client, the defendant. I think those are all matters of convenience, though, and not a matter of . . . that . . . is there reason enough in this case to just completely deny a six-minute run? I understand your argument. Your argument is really the . . . not that the disruptive behavior was not a . . . did not need to be addressed, but really the remedial response to the disruptive behavior. And why is she accepting that? Quite clearly, the courts say that you affect an abandonment, it's not a voluntary relinquishment, but if you engage in this conduct, what the court says that you basically . . . that you give up your right to counsel. Well, why, if we're talking about the district judges, the magistrate or the district judge, either one, attempting to remedy this problem, why are we not required to give him a great range of discretion in doing so? Because it's such a fundamental right. It's the Sixth Amendment right to representation. It's such a fundamental right, and I think that when you have a record like you have in this case, where it appears that he could have still exercised that right and maintained control of the proceedings. Do you have any cases which say that the district court must engage in some sort of a slow crank down of . . . that is, that they will let you . . . you can participate to defend yourself, but over here in this room, and then if that doesn't work, we'll go further. Is he required to do that? No, I don't think so, Your Honor. I don't think there's a case that actually says you have to go through stages and levels and go down four steps in the table. My argument would be that because he did . . . That's what your argument is. Yes, Your Honor, and my argument is that because that is what happened in this case, that he did put him in it, and I think he absolutely could have continued to represent himself and he had a right to, and he could have done it from under the conditions that the district court set. There are a lot of ways you can respond to those, and what you're saying is that you're imposing a sort of a rule of necessity, that is, that they can only . . . they only can do that which is absolutely demonstrated to be . . . it can't move forward. They can only . . . when it really has . . . the disruption is so much that he can't contain it. You have to keep moving forward. That imposes quite an obligation on the district court. Well, I think anytime you have someone that the court has viewed as disruptive and is getting in the way of the proceedings, removing them from the courtroom is . . . you have to do, I guess, what's least intrusive to allow that, but again, we're confusing the question of how do we deal with the disruption with does he still have a right to represent himself? And that's where I think . . . Even during the videotape, the judge had to mute it several times because he would become incoherent basically. Oh, that he did? But again, the judge had the opportunity to get . . . let him make his jurisdictional argument and then say, okay, we've had enough, that your time's up, so . . . which mine is almost up. I did want to address . . . I was going to say, do you want to address your Fourth Amendment argument? I did want to address the . . . the issue I really wanted to address is the comment on the exercise of the Fifth Amendment privilege against self-incrimination. I wanted to point out, and it's raised in the brief, in the first witness on direct testimony, the government brings out the testimony from an officer that basically the officer says, I asked Mr. Weiss to come to the car to speak with me and the prosecutor. Did Mr. Weiss . . . was he cooperative with you? No. I think under the Shaw case, the Chapman case, that that is a Doyle violation on its face. Its manifest intent was to comment and you combine that with the statement that was made during the closing argument and you combine it with the fact that the defendant wasn't even in the courtroom and he wasn't allowed to represent himself and I think we've got a . . . we've got . . . it's not harmless error, it's clear error, the two comments that were made that were brought to the court's attention in the brief. Both of them were comments on his failure to testify. They were not harmless and I think the court that there's grounds to reverse and he should get a new trial based on that as well. Thank you. Thank you, counsel. You've saved time for a vote. May it please the court? Wes Hendricks on behalf of the United States. There is no error, let alone reversible or plain error, to justify disturbing this jury's verdict. Case law and common sense support the district court's denial of the motion to suppress and the court properly discontinued the defendant's self-representation based on his incessantly disruptive and obstructive conduct. I'd like to begin . . . What's your best evidence that even after he was in the video room and after he cross-examined the expert, he continued to be disruptive? The record directly belies the argument that, hey, everything was working just fine once we started this closed circuit TV process. During the competency hearing, after the defendant had effectively shut that proceeding down and they had . . . the court had to adjust and pause proceedings and start this closed circuit TV, we did get to a point where the defendant tried to question the government's expert regarding competency. He got maybe five questions in before he went on a rant about jurisdiction, his favorite topic, but also the Treaty of Paris, and he apologized to the representatives from the British government who he knew he was going to upset by this argument. Of course, the court had to stop that, and then it was back to the status quo of the defendant not answering questions, not following the procedures that the court asked him to follow. So it was not a success. It was three, four, maybe five questions and then the Treaty of Paris, and then the court had to mute him and shut him down. But it's not just that. So I think that alone speaks for itself, that this is not a system that was going to be workable because he would do what he had done, which is shut down proceedings. Also the morning of trial, the court, again, exhibiting extreme patience with this defendant, repeatedly said, if you will just assure the court that you will act properly, not be disruptive, and follow the procedures, I will let you back in the court and you'll be able to represent yourself. On the morning of trial, he wanted to talk with the defendant. He did so through this closed circuit TV system. This is in the record of 2469 to 71. He said, we're about to start trial. I'd really prefer you to be in here. Can you do that? And again, the defendant wouldn't answer the question, instead just going on a diatribe about treason. He wouldn't state his real name. He said the court was a kangaroo court. He was being disobedient, disrespectful. And the court said, I'm sorry to hear that. This is what you've done the whole time. So we have two examples of the court trying to use this alternative system, and it's just not working. It just blew up. I'd also like to make one record point, a question that came up during opposing counsel's argument about, well, the court just wouldn't answer his question about jurisdiction. I disagree. The magistrate court did answer his question, and I do believe that the magistrate court is the one that said, the Constitution of the United States, this is a federal court, you're charged with a federal crime. But the district court also tried to answer his questions, and the defendant wouldn't allow it. You can see that in the record at 2360 to 62. He's going on and on about jurisdiction, and the court says, the jurisdiction of this court, Mr. Weiss, is, and he's interrupted again. And the court even says, do you want me to answer your question? And of course, the defendant just interrupts. And it's clear. I mean, our expert testified that this was a deliberate attempt to disrupt proceedings and delay the inevitable. He says he's been with many defendants like this, the sovereign citizen defendants, and this is a tactic. This is a delay tactic. All right? Our expert testified to that. That finding has not been challenged on appeal. So he knew what he was doing, and he was doing it on purpose. He would not assent to the court's authority over him. Case law makes clear, and Ferretta said, the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct. That's footnote 46. And the reason the court has that right is because the court must balance the Sixth Amendment right with an equally important principle that a district court judge must maintain decorum and ensure that the proceedings proceed in an orderly and efficient fashion. One additional point of law that's critical here that hasn't been discussed yet. When a defendant refuses to engage with the court about his or her desire to represent himself or herself, it cannot be error to not allow the defendant to go pro se. That is, if a court can't even get answers from the defendant about his competency and his desire, especially in light of additional charges, which is what happened here, then of course it cannot be error to say, you won't let me decide this question. You can't go pro se. That point of law can be found in both Espinoza and Long from this court. And that's what happened here. Not only was this defendant disruptive and continually interrupted the court, but he refused to answer the district court's question about his desire of self-representation. That can be found at 2177 and 2240 to 41. I mean, he effectively shut down the district court's analysis of, are you truly competent to do this? Do you understand that now the stakes have been raised? There's been a superseding indictment. Your sentencing range has increased. Are you sure you want to do this? Couldn't get answers to those questions. Under those circumstances, it cannot be error for the court to have done what it done. If anything, the court acted properly here and did what it should have done, which is ensure competency and ensure that this defendant was well represented by the public defender's office through this trial. The court also warned the defendant that he was about to lose this right. During the competency hearing, he said, okay, here's where we are, Mr. Wiest. The case law, and he quoted the case law to him, allows me to basically kick you out of the courtroom at this point and to stop your self-representation. Do you have anything to say about that? Because it's about to happen. And the only thing in response at that point was after calling everyone that was in the room with him jerks, he said this was a sham hearing. This was a corrupt court. That's at 2242 to 43. So how would you say that we should analyze it? Should we say that he forfeited the right through his affirmative misconduct? I think the most, I'm not sure if it's a forfeiture, that's an interesting question. I think the most direct way to answer it, or analyze it, is when a defendant refuses to answer the court's questions about the desire to self-represent, it's simply just not error. And in, I can't remember if it was Espinoza or Long, both faced that and said this court need not spend much time addressing this issue because the court just simply wouldn't, the defendant wouldn't answer questions about this desire under those circumstances, we're done here. It's a fundamental right, but it's not a right, it's not always error. It is not unlimited. And it was not error here, and so that's how you would. Correct. Of course, the government does not dispute that, yes, this is the Sixth Amendment right, and the review is de novo because of that. But there are many cases that say you can cross a line when you engage in serious and obstructive misconduct, or you just refuse to answer questions about the desire to go pro se. You, I guess forfeiture, I guess on the latter point, maybe it is forfeiture, Judge, but in any event, it's not error. Could the court have done it even at July 8th, whenever the competency hearing can't even take place? Yes, I believe the court could have, and that is where, I mean, at the end of that hearing, that is where he said, okay, public defender, you are now appointed to represent him, and that's when the magic moment of you're not allowed to go pro se. Now, that said, the court continually offered the defendant the ability to change his circumstances by saying, if you will just give me an assurance that you'll act properly, we can go back to the way it was, and he never got that assurance. Have you had an opportunity to discuss that, or do you want to talk more about that? Because I want to ask you, of course, I want to ask you about the prosecutor's comments. Sure. Glad to be here, Your Honor. The district court didn't err, plainly or otherwise, in limiting that expert's testimony because he, the remainder of that testimony would have been cumulative to evidence that had already been presented to the jury. I'd like to start with a standard of review, because although we support the district court's decision here, I mean, when these issues are preserved, the review is discretionary. I mean, it's abuse of discretion, and the constitutional claim that's being made is also a high bar. They have to show that the evidence was indispensable, and that it was limited without rational justification, and that's if it's preserved. The error here was not preserved. After the court made its ruling that he was, that this expert was not qualified to testify about examining an image for is this a real child or not a real child, and said, here are the topics you can discuss, defense counsel said, that's clear, okay, I got it, thank you, 2650. And there was never an objection to the limitation. So we're talking about was this error clear and obvious? Did it, can they prove that it affected substantial rights in light of the overwhelming evidence of guilt? We do not think that is a difficult question. And does it seriously undermine the faith in the judicial process? And the answer to that question is no. Can we talk about the prosecutor's, the question about the cooperation and the comment in the closing argument? Yes. During trial, the prosecutor was going through the search, kind of the day of the search, the events that happened. And okay, you went upstairs, you found this computer, you found this laptop, what happened next? And a question did come, was he cooperative? There was an immediate objection. They approached the bench, and the court instructed the defense, instructed the jury, to the extent there was any insinuation in that question that he has any obligation to be cooperative, there is none, you will disregard that, and the prosecutor simply moved on. And that's an improper question, right? Well, there's nothing in the record to demonstrate what the prosecutor was trying to do, whether was she trying to just tell more of the story? It was right after the, what did he say? It was right after he was getting into what he was saying, though. He was describing a verbal encounter, and so it was not the best question. It was not the best question. And we, I completely understand the objection, and I think the court acted properly in saying, the jury, you should disregard. And the prosecutor then simply just moved on. So your basic argument is, it might be error, but it's harmless. Well, I do not concede that it was error, because again, the record does not show really what the prosecutor was trying to do with that question. But yes, to the extent it was error, there was an immediate curative instruction, and I think it's important to note. Your argument is not plain. It's not plain, and additionally, that's not truly the basis of the argument that's being made. I mean, the focus of the argument is that this is an improper jury argument. So it's the comment made during closing argument. They point out this question, because they ... It's not plain error, though. This is straight up error, because the objections will be, and like in most cases, they have objections in both places. So that's unusual, that they actually have preserved objections. So we're not under plain error. We're under harmless error, so you have to show harmless error. On the closing argument issue, you're right. I'm sorry. I was shifting between two different issues. On the expert witness limitation, it is plain. On the closing argument, that there was an objection, the court immediately instructed the jury, and it would be our burden to show harmless error. On the closing argument issue, Your Honor. And on the cooperative question.  The basis of the argument is the closing argument, what was made. I thought it was a combination of those two things, without the right to remain silent. I thought that's the way they grouped the argument. I view it as the earlier comment shows what the prosecutor was really trying to do in closing. In any event, even if it were ... I can show harmless error here, but I can't do it now. Absolutely. Absolutely, I can. The court examines allegations of improper argument, or improper comments, by doing three things. First, you look at the magnitude of the remark. Here, the government does not believe it was over the line, especially the closing argument. There's a selective quotation of what the prosecutor said in the closing argument. And again, that's the focus of the argument here. That selective quotation is not fair. If you look at the remainder, it is clear that what the prosecutor is trying to do is rebut the idea that viruses put this child pornography on the computer. Because there's one person who does know, and that's all the quotation in the defendant's remainder is, what's on this computer, and that's the person that entered those search terms. It's the person that downloaded it. Well, it seemed to me that it went more to state-of-mind guilty knowledge, because I thought the prosecutor said, I didn't call all the children that are on the videos or in the pictures today, because we don't know who they all are, but there's one person in this room who knows what was on the hard drive, basically, or the computer. And I thought it went to his knowledge of what, that he'd actually viewed the pictures as opposed to his failure to testify about it. I view the, I take the point. I think it's, the two things are non-separate. I mean, this prosecutor had two minutes to do a rebuttal argument, and I think it's two independent points, and she shifted gears right in the middle. But in any event, it does go to the knowledge element, didn't knowingly possess this contraband that was on his computer and his hard drive. The magnitude of these remarks, again, we don't think they're over the line. To the extent they are, they're just slightly over the line in light of the immediate curative instructions, both during trial and during closing argument. You look at the effect of the cautionary instructions, the jury is presumed to follow those instructions. They were immediate, they were replete, and this judge took the issue very seriously. And finally, and most importantly here, is the strength of the evidence. And the evidence here is just overwhelming. The search terms demonstrate that someone was at that keyboard and entered search terms that clearly were searching for child pornography. They were doing so through use of a peer-to-peer system that intentionally reached out and tried to find child pornography. There were multiple computers and electronic devices in the house because multiple people lived in this house. The only electronic devices in the house that had child pornography were the laptop and the hard drive that were found in this defendant's room. That rebutts the idea that somehow viruses were responsible for this and that this defendant had no idea. There were also user-created folders on this defendant's external hard drive that he named. One was called Practice, one was called Pics. Testimony from our witnesses said peer-to-peer software doesn't create user folders. Someone created those folders and put documents in them. Someone took these documents, these images, from the computer to the external hard drive. And most importantly, included with the images of child pornography in the user-created folders were pictures of this defendant. They were actually videos of this defendant. We took a still image of his face and showed that there is essentially an image of the defendant included with this child pornography. Mr. Hendricks, we've had numerous cases where we've had to repeatedly caution about closing argument comments, some that we've reversed, some that we've just issued admonition out of Texas. Is it your position that it's okay for prosecutors to hint around the right to remain silent as long as they don't explicitly, unambiguously go into it, or is it your position that prosecutors should stay well far away from it? And you're the supervisor of this office, so is it your position that they should stay well far away from it? And do you believe that this is an example of that, or did they go too close to the line? Of course, we do not. Our position is not that prosecutors should go as close to the line as possible. Well, it seems like we have a lot of these cases. This case is not one of them. Well, we do have a lot. That's the point. And this is not good behavior. Well, I agree that there are a line of cases in this Court, and this Court has faced this issue often in the past couple of years. I don't share that view. The standard is whether a prosecutor or witness's remarks constitute comment. If the manifest intent was to comment on the defendant's silence or if the character of the remark was such, the jury would naturally construe that remark. And I earlier said it was not plain. I'm not talking about plain error. I said plain. These statements are, at best, ambiguous. At least, that's the way I read them. And I know it. We have never said in this Court that the cooperation, comment on a failure to cooperate, was a violation of this provision. I agree. I believe that's our law. Maybe I'm mistaken. That is a correct statement of the law. What I meant was the issue has been addressed many times in the past couple of years. I was addressing the failure to testify. To the extent the comment can be construed as a failure to testify. And I think the prosecutor here stayed well away from the line during closing argument. And she did what prosecutors should do. She argued what evidence was presented to the jury. And, if anything, she was more measured than she had to be. She could have said, Mr. Weiss knows what's on that computer. There were user-created files. There were things moved from his laptop. His room was the only one in the house. She didn't even do that. She said there's one person who knows. And it's the person who entered the search terms. It's the person who created those folders. That's simply arguing the evidence. And it's asking the jury to make the inference from that evidence. And then, later, she implores them to use common sense. Because common sense, given this overwhelming amount of evidence, is that, of course, of course, the person who put the child pornography on that computer was Mr. Weiss. It wasn't his mom. It wasn't the minor girls that lived in the house. It was Mr. Weiss. And the jury properly found and held him guilty. Can I just double check? All the circuits that have considered the peer-to-peer network question have ruled in the government's favor. That's correct. Every single circuit. So there's no split or anything. Every single circuit. I checked last night, Judge, and the courts are uniform on this. Both for IP addresses, the question of IP addresses, the question of shared files, the question of subscriber information. Even when the question arises about kind of how the government conducts these investigations, no court has held that it's a violation of the Fourth Amendment. You can find that in Christie and Connor and Burowie, Bynum, Wheelock. The case law is repeat there. That's based on the third-party exception. There's an argument that somehow Riley changed things. Riley addressed a different doctrinal point, search incident to arrest, not something that's in play here. The district court properly denied the motion to suppress and was roundly supported by the case law. Your Honor, I see that my time has expired. May I conclude? Briefly. Your Honor, what the district court here did was exhibit extreme patience with this defendant. There was no improper argument or improper comment, and to the extent there was, it was certainly harmless in light of the overwhelming evidence of guilt. And we would ask this court to affirm the judgment and the jury's verdict. Thank you. Well, I think there's a problem right there, is the government would stand up here and tell you that those two comments are not improper, that they don't go across the line. The one comment is almost identical to what happened in Shaw. The police officer says, I asked Mr. Wiest to come to the car with me to speak with me, and the prosecutor said, did Mr. Wiest pause, think about it, let's go there anyway. Was he cooperative with you? No. Not was he cooperating in the investigation, was he cooperating with the government in prosecuting other individuals? No. I asked him to speak with me, did Mr. Wiest dot, dot, dot, was he cooperative with you? That's not across the line. And then she goes on later in her rebuttal and argument, we can't bring in every child. There is one person who knows what content or something to that effect. There is one person who knows what the content was. That's what it was. After saying she can't bring in every child. After the defendant has been removed from the courtroom. After he's been denied the right to Sixth Amendment. This court has repeatedly tried to tell these, I've been doing this for 24 years, and we just keep seeing these comments over and over again. They're unfair, they're low blows, and they're frankly, they're just offensive. And the bottom line is, until they get reversed, the government is going to come up here and tell you what he just told you today. And that is, there's nothing wrong with this argument. It doesn't cross the line. You know, in fact, she could have, she could have even. Can we reverse if it's, if they can't show harmless? And why can't they show harmless here? Because there's so much evidence. Excellent. I'm glad you asked that because I might have forgotten to address it, Your Honor. Chapman discussing Doyle here. Chapman says there's three types of Doyle error. When the prosecutor uses the silence to impeach the story. It's exactly what she did in closing argument in this case. And that's exactly what he just stood up here and argued why it was okay for her to make that argument. She was using his silence to impeach the story that this computer was susceptible to being hacked. And it was indeed susceptible to it. That's one type of Doyle error. When that happens, there is no harmless error analysis. When she tries to tie the silence to his story, to impeach the story, there is no harmless error analysis. Okay, the second type is when the prosecutor does not tie the silence to the story, but it happens more than once. In that case, there's got to be overwhelming guilt to find harmless error. And the third type is when it's just a single reference. It's not a single reference in this case. So the third type of Doyle error isn't even in question. It's either one or two, and I submit it's number one, and there's no harmless error analysis in this case. As far as I do want to address the point there on the denial of our opportunity to present our expert, after every witness it seems like that the government presents can be classified as an expert on whether talking about chickens is code language or whatever it may be. We had a half-day hearing where I put on every piece of evidence that I intended to get into with this expert. The judge waits until I put the expert on the trial, and he says, okay, well let me tell you what I'm inclined to do. I'm inclined to let him if he wants to testify that images can be altered. Not about these images, but that images can be altered. That was one area where I wanted my expert to testify. My response is that's fair. Then the judge goes on and goes, well, in other words, and he starts to tell me how I'm limited in every other area, and at the end of that, and I did. I said, well, Your Honor, I asked him to clarify how I was being limited, and then at the very end of it I said, Your Honor, I need to figure out if I need to make an objection here. And the judge, what you put up record Friday, the things that you want to ask him, I'm telling you, you can't ask him any of those things except what I've told you. We had a half-day hearing. We had a discussion at the bench. At the beginning I thought he was letting me get into everything except for whether these particular images were altered, which I thought was fair enough. If you need to make an objection or whenever you actually try to present it, say, Your Honor, I'd like to go into these areas now and have him tell you, no, you can't. Yeah, I wish I had done that, Your Honor. I mean, shouldn't you have done more in preservation here? Should have, I don't know. In this particular court, I don't know. He told me what I could do, and I asked him if I needed to put a further objection on. He said, no, I'm telling you, what you put on record a Friday, I'm not letting you put it on. I think that makes it clear. The issue that was brought to the court's attention he ruled on, he told me what I could do. I wish I had done what you said, Your Honor, honestly, frankly. Sure do. It would be cleaner now. But anyway, I wanted to address that. I don't think it's so clearly plain error. And my little statement in there of that's fair is completely out of context with what ultimately happened. I see my time's up. Thank you all very much. Thank you.